## AFFIDAVIT OF SPECIAL AGENT HANNAH WONG IN SUPPORT OF A COMPLAINT FOR CIVIL FORFEITURE

I, Special Agent Hannah Wong, state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent for the Federal Bureau of Investigation ("FBI") since October 2023. As a Special Agent assigned to the Economic Crimes Squad of the FBI's Boston Field Office, I investigate complex financial crimes, including money laundering, wire fraud, mail fraud, and bank fraud, among others. Prior to my appointment as a Special Agent, I worked at SpaceX as a financial analyst for four years and as an accountant for two years.

### PURPOSE OF AFFIDAVIT

2.      I submit this affidavit in support of a Verified Complaint for Forfeiture *in Rem* against the following Tether ("USDT[1]"):

    a.  200,000.039646 USDT associated with the cryptocurrency wallet with the address 0x14358cf97cd504da3d2c293fa68d1a69400180e1

(the "Defendant Property"). The wallet with the address 0x14358cf97cd504da3d2c293fa68d1a69400180e1 is referred to in this affidavit as the "Target Wallet" while the USDT associated with it is the Defendant Property.

3.      As set forth below, there is probable cause to believe that the Defendant Property represents proceeds traceable to a violation of 18 U.S.C. 18 U.S.C. § 1343 (wire fraud) and is property involved in violations of 18 U.S.C. § 1956 (money laundering) and is subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

4.      The Defendant Property was seized pursuant to a seizure warrant issued in the

---

[1] USDT is a stablecoin. USDT is pegged to the price of the U.S. dollar, meaning that each USDT token is worth approximately $1.00. Payments or transfers of value made with USDT are recorded in the blockchain network. Tether Limited is the company that manages the smart contracts and the treasury (*i.e.*, the funds held in reserve) for USDT tokens.

District of Massachusetts on June 10, 2025. To seize the applicable USDT, Tether Limited will "burn" (*i.e.*, destroy) the USDT tokens currency associated with the cryptocurrency wallet and reissue the equivalent amount of USDT tokens and transfer that equivalent amount to a government-controlled cryptocurrency wallet. In accordance with this process, Tether transferred the Defendant Property to a U.S. government-controlled wallet on August 5, 2025.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from witnesses and cryptocurrency exchanges, other federal investigative personnel, and my review of other records. This affidavit is intended to show that there is probable cause for the forfeiture of the Defendant Property and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## BACKGROUND ON CRYPTOCURRENCY

6. Based on my training, research, education, and experience, I am familiar with relevant terms and definitions discussed below.

7. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat[2] currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrencies are Bitcoin, Litecoin, Monero, and Ethereum. Cryptocurrency can exist digitally on the internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer

---

[2] Fiat currency, such as the U.S. dollar, is backed by a government, but not by a physical commodity such as gold.

cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[3]

8. ETH is a cryptocurrency similar to Bitcoin[4] that runs on the Ethereum blockchain as opposed to the Bitcoin blockchain. Payments or transfers of value made with ETH are recorded in the Ethereum blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire ETH through exchanges (*i.e.*, online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people. Individuals can also acquire cryptocurrencies by "mining." An individual can "mine" bitcoins by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smartphones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the

---

[3] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

[4] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the cryptocurrency. That practice is adopted here.

identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.

9. Ethereum is a well-known blockchain that can be used to create different cryptocurrencies. There are many Ethereum-based cryptocurrencies that utilize the Ethereum blockchain, which are referred to in the cryptocurrency community as "tokens." Each Ethereum-based token has its own coding (or "smart contract") that governs how the token will operate. Tokens built using the Ethereum blockchain are fungible, meaning they can be exchanged with other Ethereum-based tokens.

10. Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. USDT (Tether) is a type of stablecoin.

11. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers. Each public address is controlled and/or accessed using a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of

an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

12. Although cryptocurrencies such as ETH have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes, including money laundering, and is an oft used means of payment for illegal goods and services on hidden services websites operating on the Tor network.

13. Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile and online wallets are electronic in nature, they are located on mobile devices (*e.g.*, smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the internet.

14. Cryptocurrency exchanges are individuals or companies that exchange cryptocurrency for other currencies, including U.S. dollars. According to the Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[5] Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under

---

[5] See "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," available at https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-persons-administering.

applicable state law). From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act ("BSA") anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account.

## BACKGROUND ON CRYPTOCURRENCY INVESTMENT SCHEMES

15. "Pig butchering" cryptocurrency investment schemes involve criminal actors engaging in social engineering, which allows the criminal actors to steal victims' funds through virtual currency payments and/or fraudulent investments. The phrase "pig butchering" is translated from the Chinese "shāzhūpán" and refers to a scam in which the victim is "fattened up prior to slaughter." Pig butchering scams typically involve four stages. First, a perpetrator will use a fictious identity and cold-contact a victim, often via text message or messaging application, social media, a dating application, or other communication platform. Oftentimes, the perpetrator will pretend to have contacted the wrong number but will continue communicating with the victim. Second, the perpetrator will establish a relationship and build trust with the victim by continuing to message over days, weeks, or months. Third, the scammer will concoct a narrative to induce the victim to send a series of payments in the form of virtual currency. Common narratives include lucrative investment opportunities or emergencies necessitating funds. Many perpetrators will convince victims to use fraudulent websites or applications, controlled by scammers, to invest in virtual currency. Perpetrators coach victims through the investment process, show them fake profits, and encourage victims to invest more. In the fourth stage, perpetrators disengage victims once they have stolen their funds. In scenarios when victims stop

sending more payments, the perpetrator cuts off all contact. In schemes involving fraudulent investment platforms, victims are told they need to pay a fee or tax when they attempt to withdraw their money. Victims are then unable to get their money back from perpetrators, even if they pay the fake fees or taxes.

## **PROBABLE CAUSE**

16. As set forth below, there is probable cause to believe that the Defendant Property represents proceeds obtained through violation of 18 U.S.C. § 1343 (wire fraud) and/or is property involved in violation of 18 U.S.C § 1956 (money laundering).

17. Pursuant to 18 U.S.C. § 981(a)(1)(C), property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, specifically violations of 18 U.S.C. § 1343 (wire fraud), is subject to civil forfeiture. Pursuant to 18 U.S.C. § 1961(1), as incorporated by 18 U.S.C. § 1956(c)(7)(A), violations of 18 U.S.C. § 1343 are a specified unlawful activity. It is a violation of 18 U.S.C. § 1343 for a person to devise and intend to devise a scheme and artifice to defraud for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud.

18. Pursuant to 18 U.S.C. § 981(a)(1)(A), property, real or personal, involved in a transaction or attempted transaction, here, violations of 18 U.S.C. § 1956(a)(1)(B)(i) and (h) (money laundering and conspiracy to commit money laundering) or property traceable to such property is subject civil forfeiture. It is a violation of 18 U.S.C. § 1956(a)(1)(B)(i) (laundering of monetary instruments) to conduct or attempt to conduct a financial transaction knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the

source, the ownership, or the control of the proceeds of a specified unlawful activity. It is a violation of 18 U.S.C. § 1956(h) to conspire to engage in the offense of money laundering.

### THE FRAUD SCHEME

19.     As set forth in the description of the fraud scheme below, unknown subjects (the "Target Subjects") communicated with a victim first through a dating application. After cultivating a relationship, the Target Subjects, who appeared to be one individual, but may be more than one person, then transferred communications with the victim to WhatsApp. Through these communications, the Target Subjects convinced the victim to invest in cryptocurrency trading. Target Subjects then directed the victim to purchase ETH and transfer the currency to intermediary wallets controlled by the Target Subjects. The victim believed they were investing in a legitimate platform, when in fact the Target Subjects[6] were instead sending victim funds to intermediary wallets, converting victim funds from ETH into USDT, and transferring to the unhosted[7] Target Wallet, and stealing the funds.

*Victim 1*

20.     Victim 1, a Massachusetts resident, met a man on Tinder who went by the name "Nino Martin" in or around January 2025. Soon after matching on Tinder, Martin transitioned the conversation to WhatsApp and told Victim 1 that he was a financial advisor and could help them make money by doing cryptocurrency trading through a platform called onchainnm.com.

---

[6] It could be that the same individual or individuals communicating with the victim caused the transfer of funds, or it could be done by other unknown subjects working in conjunction with those who are communicating with the victim directly. For purposes of this affidavit, Target Subjects refer to all unknown subjects participating in the fraud scheme.

[7] An unhosted wallet, also known as a self-hosted or non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (*e.g.*, a virtual currency exchange) to facilitate a transaction involving the wallet.

Martin instructed Victim 1 to transfer funds from their bank account to their Coinbase account then to the onchainnm.com platform. During this process, Victim 1 accidentally showed Martin a screenshot of their bank account which showed a balance of approximately $500,000.

21.     Coinbase records provided by Victim 1 showed that over the next few weeks Victim 1 transferred approximately 142.62 ETH ($384,413.04[8]) to unhosted wallets which Victim 1 believed to be the onchainnm.com platform. Victim 1 initially made two smaller transfers of approximately 0.30 ETH ($1,000.35) and 1.12 ETH ($3,547.37) on or about January 24, 2025, and January 28, 2025, respectively. After trading and seeing profits in their onchainnm.com account, Victim 1 began investing larger sums to include 9.45 ETH ($29,211.37) on or about January 29, 2025, 18.15 ETH ($49,478.03) on or about February 4, 2025, 40.82 ETH ($107,068.17) on or about February 7, 2025, and 72.78 ETH ($194,107.75) on or about February 18, 2025.

22.     During this time, Victim 1 was in constant contact with Martin through chat messages in WhatsApp, but never met him in person. Martin gave various excuses to Victim 1 as to why they could not meet, such as needing to fly to Florida to give a presentation.

23.     On or about March 7, 2025, the investment platform onchainnm.com changed their name to onchainiy.com. Around this time period, Victim 1 was restricted from their Coinbase account due to sending suspicious transfers. Target Subjects purporting to be customer service from onchainiy.com provided Victim 1 with a workaround to Coinbase in order to continue investing. Victim 1 was instructed to wire money from their bank into bank routing and account numbers provided by the Target Subjects. The respective amount would then be

---

[8] All USD equivalents from Victim 1's Coinbase records are based on the conversion rate of ETH at the time of the transaction.

deposited into Victim 1's account on the onchainiy.com platform and Victim 1 could use the funds to continue to invest. Victim 1 complied and sent approximately $112,353 in additional funds from on or about March 28, 2025, to on or about March 31, 2025.

24. On or about April 7, 2025, Target Subjects purporting to be customer service at onchainiy.com informed Victim 1 that they needed to pay an IRS tax of approximately $200,000. Victim 1 grew suspicious and stopped sending money. In total, Victim 1 estimated they had transferred approximately $504,353 of their money into onchainnm.com and onchainiy.com which represented almost all their savings.

25. Based on my training and experience, I am aware that scammers in cryptocurrency investment schemes utilize websites and applications that appear to show an investment platform with victims' account balance and profit information, but in reality, the website or application and any balance and profit information are entirely fraudulent. Here, the Target Subjects used a purported investment platform, referred to as "onchainnm.com" and "onchainiy.com", which appears to have been created by the Target Subjects for the sole purpose of deceiving victims and facilitating the fraud scheme. I have viewed www.onchainiy.com, and it appears to resemble a standard cryptocurrency trading platform. I have also attempted to view www.onchainnm.com, but it appears to no longer be an active website.

26. Based on my training and experience, I know that fraudsters commonly spoof the names of legitimate companies or use cryptocurrency buzzwords in order to gain trust from victims. I believe that the names "onchainnm.com" and "onchainiy.com" were intentionally similar in spelling to "Onchain," which is a term used to describe transactions that occurred on a blockchain and have been verified and authenticated. The names are also similar to "Crypto.com Onchain" which is a legitimate application used for user custodied wallets. Multiple variations of

this website have been reported by several victims of fraud. Based on open-source records, www.onchainnm.com was created on or about December 1, 2024, and onchainiy.com was created on or about March 7, 2025.

27. Based on my training and experience, I am also aware that fraudsters and money launderers will often change the form of cryptocurrency in an effort to obscure the source of the funds and make tracing transfers of funds more difficult. Fraudsters and money launderers often use decentralized exchanges that do not do not require KYC documentation to change the form of cryptocurrency. I am also aware that fraudsters and money launderers will transfer funds to stablecoins such as USDT to avoid market volatility of other forms of cryptocurrency, such as ETH. Based on my training and experience, I am aware that fraudsters and money launderers will often use intermediary hops or transfers to intermediary wallets to try to obscure the source of the funds and make tracing the transfers of funds more difficult.

## GRAPHICAL REPRESENTATION OF THE FLOW OF VICTIM FUNDS

28. Victim 1's Coinbase records showed that between January 24 and February 18, 2025, Victim 1 purchased approximately 142.62 ETH ($384,413.04) and sent the funds to unhosted wallets. The FBI utilized forensic tracing techniques to trace transactions that were sent to the Target Wallet and revealed that approximately $109,100 of Victim 1's funds were frozen in the Target Wallet.

29. On February 18, 2025, Victim 1 sent approximately 72.78 ETH from their account at Coinbase to an intermediary unhosted Wallet: 0x8bc52c



Approximately seven minutes later, Victim's 1 ETH was sent to Wallet: 0x8b505d



Less than seven hours later, Victim 1's ETH was sent to the Wallet: 0x47754a



Less than one hour later, Victim 1's ETH was sent to Tokenlon where it was converted into USDT then sent back to the 0x47754a Wallet:



Finally, less than one hour later, Victim 1's USDT was sent to the Target Wallet:

13



## SUMMARY OF TARGET WALLET AND COMMINGLING OF FUNDS

30. In total, the Target Wallet was active from February 18, 2025, until February 22, 2025, received a total of approximately 214,117 USDT, and sent a total of approximately 14,117 USDT.

31. Victim ETH was transferred through multiple hops among unhosted wallets before arriving in 0x47754a. Once victim ETH was received and commingled with additional funds to obfuscate the origin, the Target Subjects utilized decentralized exchanges such as Tokenlon to convert ETH into USDT. The converted USDT was then received back into 0x47754a and sent to various other unhosted wallets controlled by the Target Subjects, including the Target Wallet.

32. Based on my training and experience, a review of the transactions containing victim funds demonstrated that the Target Subjects displayed tactics typically used in money laundering transactions and did so for the purpose of attempting to conceal the origin of the fraud proceeds. Specifically, the Target Subjects transferred victim funds through multiple hops of unhosted wallets and converted victim funds from the original cryptocurrency (ETH), into a different cryptocurrency (USDT). Additionally, victim funds received into the Target Wallet were commingled with funds other of unknown origin including funds from an exchange located

14

in Bangkok, Thailand.

33.     Accordingly, there is probable cause to believe that the funds in the Target Wallet are property involved in a violation of 18 U.S.C. § 1956 (laundering of monetary instruments) and are subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).

## CONCLUSION

34.     Based on my knowledge, training, and experience, and the foregoing information set forth in this affidavit, I respectfully submit that there is probable cause to believe that at least 109,100 USDT of the Defendant Property are proceeds traceable to violations of 18 U.S.C. § 1343 (wire fraud) and/or that the Defendant Property is property involved in money laundering, in violation of 18 U.S.C. 1956(a)(1)(B)(i), or property traceable to such property and is therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C).

Pursuant to 28 U.S.C. § 1746, I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed this 12 day of January, 2026.

Respectfully submitted,

Hannah Wong
Special Agent
Federal Bureau of Investigation

15